**In re Kenneth A. RAYMOND, Jane G. Raymond, Debtors.**

**Bankruptcy No. 8300533.**

United States Bankruptcy Court, D. Rhode Island.

April 18, 1984.

John Boyajian, Boyajian, Coleman & Harrington, Providence, R.I., Trustee.

Russell Raskin, Providence, R.I., for debtors.

## DECISION

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on March 1, 1984, on the trustee's request for authorization to solicit offers on certain assets of the debtor Kenneth Raymond. Kenneth and Jane Raymond filed a joint Chapter 13 petition on July 26, 1983. The first confirmation hearing was held on August 30, 1983, and since then there have been several continued hearings. On January 20, 1984, the debtors filed a modified plan. To date the debtors have had the protection of the automatic stay, 11 U.S.C. § 362, for almost nine months, and confirmation of a plan is not imminent.

The trustee's motion is styled, somewhat misleadingly, a "Motion to Allow Trustee to Sell Assets" in this Chapter 13 case. Both in his memorandum in support of said motion and at the hearing, the trustee emphasized that what he sought was not an immediate sale of any of the debtors' assets, but only Court authorization to solicit offers for Kenneth Raymond's interest in Rock City Box Corporation (Rock City), a business which manufactures corrugated and wood products.

At the outset, the Court rejects the debtors' contention that "[t]he trustee does not have standing to sell the debtors' assets." Debtors' Memorandum in Support of Objection to Trustee's Motion to Sell Assets at 2. In the particular circumstances of this case,[1] where the position of creditors appears to be extremely tenuous and where the standing of the debtor Kenneth Raymond on the issue of good faith is equally as tenuous, 11 U.S.C. § 105(a) provides ample authority for the exercise of the Court's discretion with respect to the exposure and/or sale of the debtors' property.

The following brief resume of facts deduced from the evidence is helpful to an understanding of the Court's findings and conclusions: Kenneth Raymond owns 50%

1. The disturbing aspects of this case are described elsewhere in this opinion.

of the shares of Rock City, and John Pezza owns the remaining 50%. Relations between the partners are strained; each is convinced that his own value to the corporation far outweighs those of his partner, and each believes that the other could be replaced without difficulty. For personal reasons, Pezza has been attempting to sell his interest in the business for more than a year, and he does not oppose the trustee's motion seeking authorization to sell Raymond's share, along with his, as part of a total package. It is undisputed that a single sale of 100% of the stock is likely to bring a greater price than two separate sales, each of 50%.

Kenneth Raymond contends that the best chance for fulfillment of his Chapter 13 plan, which provides for 100% payment to all creditors,[2] is his retention of his share of ownership of Rock City, and his continued involvement in the business. Two witnesses who testified in his behalf and who appear to be very friendly competitors stated that Raymond's presence as "Mr. Outside"—the outside salesman—is extremely valuable and in fact essential to the business. The direct evidence by Raymond and his supporting witnesses presented a most encouraging picture of the prospects for a highly successful Chapter 13 case, based upon Raymond's continued involvement in a corporation which they claim should become highly profitable very quickly, and in which the value of the stock could double or treble in a year or two. When the debtors' direct evidence was concluded, a version had been provided that "Mr. Outside" was indeed also "Mr. Indispensable", and that he was the only hope for Rock City's survival and further growth.

This proceeding, however, provides a graphic example of the proper functioning of the adversary system. After cross-examination and the evidence presented by the trustee, a very different picture of this Chapter 13 case, of Raymond's good faith,

and of his role in Rock City emerged. Certainly the single most important factor in undermining Raymond's credibility was the testimony elicited in the trustee's cross-examination of Raymond. A series of "mistakes," admitted "exaggeration," inconsistencies, and failure to disclose significant information in the Chapter 13 schedules, all combined to present a dramatically different, and certainly more accurate, picture of this case.[3]

In addition, John Pezza, whom the Court found to be a most credible witness, testified convincingly that Raymond's value as "Mr. Outside" was not nearly as great as the glowing description provided by Raymond and his friends would suggest. Based on Pezza's testimony, I am also satisfied that Raymond has failed to bring in any significant new business, and that his presence adds no magic to the prospects of Rock City. Pezza was a forthright and conservative witness, not eager to exaggerate or to volunteer self-serving matter—in sharp contrast to the testimony of Raymond and his friendly witnesses Fullmer and Trasavage.

What the trustee seeks is Court authorization to solicit offers for Raymond's interest in Rock City. No sale will be consummated without Court approval, and the debtors have the opportunity to be heard prior to the authorization for any such sale. Granting the trustee's motion hardly imposes on the debtors an onerous burden. Furthermore, if at any time the debtors should modify their plan or its implementation so that it is more consonant with the purposes of Chapter 13, there may be no need for a sale of the assets in question. Thus, based upon all the evidence, the Court concludes that the trustee's proposal to seek buyers for Raymond's 50% interest in Rock City is eminently reasonable, and his motion should be granted.

Comment on the following examples of Kenneth Raymond's inability or unwilling-

2. The extent of the Raymonds' unsecured debt, as well as the amount of the encumbrances on their real estate, are in dispute, and creditors contend that the debt is significantly greater than scheduled. It also appears, based on the

record to date, that the debtors' 100% plan is quite illusory.

3. For a partial list of Raymond's inconsistencies, lack of candor, and lack of good faith, see infra notes 5–8 and accompanying text.

ness to be straightforward, although not essential to the disposition of the issue now before the Court,[4] may provide some insight to him regarding the degree of fairness to which he will be held in his dealings with creditors prior to any confirmation.

1. The debtors' amended plan provides for a $35,000 payment to the trustee on December 31, 1984. When questioned as to the source of this payment, Raymond responded that $35,000 was a mistake, and that he intended to make a $15,000 payment on that date. This affront is compounded in that Raymond has not provided a credible explanation of where even the $15,000 would come from.[5] Neither has he filed a modification of his plan to reflect the newly discovered $20,000 reduction in the amount to be paid to creditors in December 1984.

2. Raymond is to receive 50,000 shares of stock in a corporation known as TMI in June 1984. He failed to include this item in his schedule of assets, but listed that same stock less than one year earlier on a financial statement when seeking a loan.[6] On the financial statement (Trustee's Exhibit A), Raymond listed the cost of the TMI stock as $255,000, and the market value as $175,000. On cross-examination, he was unable to explain the "cost" figure, admitted that he had not purchased the stock, and asserted that he had done extensive consulting work for TMI, with the stock being "remuneration for [his] efforts." With respect to the market value of the stock, Raymond testified that his understanding at the time of the 1982 financial statement was that lettered, unregistered stock was worth 20% to 35% of the value of registered stock.[7] In the Bankruptcy Court, he now values the stock at closer to 10% of the value of registered stock, and said that his reassessment resulted from discussions with a stockbroker.

3. In the same financial statement, Raymond listed as assets "art—antiques and personal property" in the amount of $125,-000. In contrast, again, the Chapter 13 statement estimates the "total value of household goods to be $4,000.00 and personal effects to be $1,000.00." Raymond's attempted explanation for this extraordinary discrepancy is that (1) the figure on the loan application was a "great exaggeration;" (2) several paintings in the house (as well as numerous other assets) are owned by Computex Corporation, in which the Raymonds' two children are the sole stockholders; and (3) he and his wife are "merely custodians" of the household furniture, because of "an understanding" that it was intended to pass from Mrs. Raymond's parents to their daughter Sarah.[8]

4. The evidence introduced in this proceeding was extensive, given the narrow issue of whether the trustee should be granted Court authorization to solicit offers for Raymond's interest in Rock City. The debtors chose to broaden the scope of examination far beyond the narrow issue raised by the trustee's motion.

5. Raymond testified that he proposed to obtain the money "[e]ither from a loan or from some sale of [his] stock" and that he had been "told by one individual that he would loan [Raymond] that money if [Raymond] could give him the [Rock City] stock as security."

6. Raymond testified that in preparing the 1982 financial statement (Trustee's Exhibit A), he considered the TMI stock to be "part of [his] assets," and he defined an asset as "something of value that you own." His understanding of his assets in the Chapter 13 case, however, is somewhat different: "What we actually and physically owned." At the time of filing the Chapter 13 petition and schedules, Raymond testified that he did not believe he actually "owned" the TMI stock because he had not yet received it.

7. Even using Raymond's figures, however, 20% to 35% of the $255,000 "cost" of the stock would result in a market value of, at most, half the figure of $175,000.

8. Jane Raymond testified that her mother's will provided that the furniture and antiques were to pass to Mrs. Raymond and then to her daughter. She was uncertain, however, of the provisions of her mother's will, and despite the Court's invitation to debtors' counsel that the will should probably be introduced in evidence, the will has failed to appear. On cross-examination, Mrs. Raymond conceded that although her mother died in 1977, it was within the past two years that Mrs. Raymond had made a gift of the furniture to her daughter. It would be most difficult to credit the Raymonds' testimony that they are mere custodians of the property in their house.

4. When questioned about the feasibility of funding the Chapter 13 plan, Raymond testified that he and Pezza orally agreed that each would receive a $200 per week increase in salary after the company became profitable, and that such an increase was likely within 60 to 90 days. Pezza, whom the Court found to be a much more credible witness, testified that no such agreement had been made. Even, but only for the sake of discussion, accepting Raymond's version of the "pay raise" as accurate, feasibility of this plan appears to be nil at this time.

In his summation, debtors' counsel made the extraordinary argument that this case represents "Chapter 13 at its very finest." I have seldom seen this Chapter sought to be used in a less meritorious fashion, or with lower regard for either the perception or the interests of creditors. Counsel also suggests that Raymond's answering questions truthfully at the § 341 meeting— when confronted with his failure to include significant information in his sworn schedules—deserves accolades. This Court views Raymond's testimony so differently that one wonders whether debtors' counsel may have had some other case in mind when he was speaking eloquently of the "exciting opportunity" now before the Court. In summary, to give credence to Kenneth Raymond's explanations of his conflicting statements (oral and written) and his questionable schedules, the trier of fact would have to have been born yesterday.

For the reasons stated, the trustee's motion seeking authorization to solicit offers for the sale of Kenneth Raymond's interest in Rock City Box Corporation is granted.

Enter judgment accordingly.